UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| HARLAN and PAULINE HECKSEL, | Civil No. 03-2604 (JRT/JSM) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CENTRAL LIVESTOCK ASSOCIATION, INC. and COOPERATIVE RESOURCES INTERNATIONAL, INC., | |
| Defendants. | |

Paul Egtvedt, **HALUNEN & ASSOCIATES**, 220 South Sixth Street, Suite 2000, Minneapolis, MN 55402, for plaintiffs.

David J. Lauth and Kevin A. Finnerty, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for defendants.

Plaintiffs, participants in a livestock feeding program, brought suit against the program for breach of contract, breach of fiduciary duty, violation of the Packers and Stockyards Act, violation of the Commodities and Exchange Act, violation of the Racketeer Influenced and Corrupt Organizations Act, violation of various Minnesota consumer fraud laws, and common law fraud. The defendants counterclaimed for breach of contract, and now move for summary judgment on the claims and counterclaim. The Court grants in part and denies in part the motion.

## BACKGROUND

Defendant Central Livestock Association ("CLA") is a Minnesota cooperative that operates livestock markets, markets livestock, and operates a Livestock Feeding Program ("LFP"). CLA is a subsidiary of defendant Cooperative Resources International ("CRI"), a Wisconsin cooperative. Prior to 1998, plaintiffs Harlan and Pauline Hecksel purchased and raised cattle that they then sold, sometimes at livestock markets operated by CLA. In May 1998, the manager of the CLA market in Albany, MN, Robert Wegenast, invited the Hecksels to join the LFP. At the time, Harlan Hecksel was selecting cattle to purchase at the Albany market. According to the Hecksels, they understood from Wegenast that if they participated in the LFP, CLA would select and tag cattle for the Hecksels, finance the Hecksels' purchase of those cattle, and assist in marketing and selling the cattle in exchange for a per head charge plus interest.

CLA bought the cattle that Harlan selected at the May 1998 market. On the purchase receipt for the cattle that Harlan had selected, his name is crossed out as the purchaser and replaced with the LFP. Shortly thereafter, the Hecksels were given the "first option" to raise some cattle that CLA had purchased in Florida. On June 22, 1998, after initially declining all of the Florida cattle as the wrong breed and possibly ill, the Hecksels decided to accept some of the animals in the herd. According to the Hecksels, Wegenast convinced them to take the cattle, promising that if they had trouble with the cattle, CLA would make it right. At the time of the delivery of the Florida cows, Hecksel asked for the price per pound and the actual weights of the cattle. Although Wegenast told Hecksel that he would get them the scale tickets and slips with prices shortly, the Hecksels never received any scale tickets. Furthermore, contrary to Wegenast's

representations to the Hecksels, the cost per pound of the Florida cattle was in the high $0.80s, rather than the low $0.70s.  The Hecksels assert that they were unaware of any right to subsequently reject the cattle, and trusted Wegenast's promise to replace any death loss.  According to the Hecksels, the June 22 cattle and a second load of Florida cattle delivered on June 30, 1998 suffered a high percentage of death losses.

On July 1, 1998, the Hecksels signed a Livestock Feeding Agreement ("LFA"), effective June 10, 1998.  Both the May 1998 market cattle and the Florida cattle were assigned to the Hecksels under the LFA.  Under the LFA, CLA purchases cattle and delivers them to LFP participants like the Hecksels.  The participants have 24 hours to inspect and reject any livestock that are ill or injured.  Participants must identify and keep the CLA cattle physically separated from any livestock owned by the participants.  Participants are responsible for maintaining "good quality facilities" for the livestock; pay all of the expenses associated with raising the cattle they have accepted, a program fee of $15/head, and a daily variable service fee based on the financing CLA has obtained to purchase the cattle; and are expected to raise the cattle to market weight within a reasonable period of time.  CLA retains ownership of the cattle at all times, as well as a UCC security interest in the cattle, any offspring, and any additional cattle purchased by the participants to replace any death loss.  CLA has the right to make all decisions related to the marketing of the livestock including but not limited to when, where, at what size, and to whom the livestock are sold, and whether and what kind of price protection strategies should be used.  Once the cattle are sold, the various charges are subtracted from the ultimate sale price of the cattle, with the balance, if any, remitted to the participants.  Charges are assessed for all cattle delivered to the participants – including

those that have died or for some other reason are not sold. If the sale price is insufficient to cover the charges, participants are responsible for making up the difference. According to the Hecksels, they did not realize and were not informed that the preprinted LFA contained terms different from those they believed they had agreed to with Wegenast.

CLA conducted periodic inspections of the CLA cattle at the Hecksels. According to the Hecksels, at inspector Mike Hartwig's insistence, they replaced 25-30 death losses from the Florida cattle with their own cows, believing that they would be replaced by CLA at a later time, and signed blank inspection forms that Hartwig filled in later.

Between June 1998 and 2000, the Hecksels took delivery of approximately 700 head of cattle, including the Florida cattle. Most of these cattle were successfully raised to market weight and marketed through CLA. Seventeen of nineteen sales resulted in profits for the Hecksels. The Hecksels assert, however, that the settlement statements and inspection reports from that time indicate very high death losses. In addition, according to the Hecksels, the CLA cattle did not gain weight at the normal rate, resulting in higher feed costs, requiring greater care from the Hecksels, and leading to higher service fees attached to each cow because the cattle stayed in the Hecksels' care longer than expected. The Hecksels assert that these increased expenses drove them into debt with CLA, and forced them to acquire more cattle through the LFP in order to try to make up the losses.

According to the Hecksels, after delivery of the Florida cattle to their farm, the Hecksels experienced a significantly higher than normal death loss in their own herd. The Hecksels assert that Dr. John Thell performed testing on their cattle and grounds in the spring of 1999 to try to determine the cause of the increased death rate. The Hecksels

claim that Dr. Thell told them that some sort of contamination had been introduced to the farm, although Dr. Thell could not determine exactly what the contamination was or where it came from. An affidavit filed by Dr. Thell denies this claim. The Hecksels assert that the only possible source of contamination was the Florida cattle.

The Hecksels contend that CLA was supposed to assist them in marketing the cattle, and that CLA promised on at least one occasion to put the Hecksels' LFP cattle in the ring first in order to obtain a good price, but that neither of these things happened. Additionally, the Hecksels insist that CLA overcharged them with respect to the variable service fee and various other fees, including insurance, hedging fees, identification costs, hauling costs, transit insurance, beef council/beef promotion fees, and veterinary fees.

The Hecksels also claim that CLA convinced them to purchase a hedging contract on the LFP cattle that eventually resulted in the Hecksels owing CLA a significant amount of money. Finally, the Hecksels claim that CLA filed a blanket UCC-1 form asserting a security interest in all of the Hecksels' cattle, including non-LFP cattle, and that this security interest prevented the Hecksels on a number of occasions from selling their own cattle without CLA's permission.

According to CLA, by 2002, the Hecksels stopped providing the cattle the same amount/quality of food and vaccinating them. A number of cattle, including cattle owned by both CLA and the Hecksels, died. As of December 8, 2003, CLA records indicated that the Hecksels had 94 head of CLA cattle. These 94 head have never been sold and are, apparently, dead. The Hecksels have largely stopped raising livestock, and now farm and run a metal fabrication business.

The Hecksels brought suit against CLA and CRI in March 2003, alleging breach of contract, breach of fiduciary duty, violation of the Packers and Stockyards Act, violation of the Commodity and Exchange Act, violation of the Racketeer Influenced and Corrupt Organizations Act, violation of various Minnesota consumer fraud laws, and common law fraud. CLA counterclaimed against the Hecksels for breach of contract, alleging $68,764.40 in damages related to the unaccounted for 94 head of cattle. CLA moves for summary judgment on all of the Hecksels' claims and on its counterclaim.

## ANALYSIS

### I.     Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id*.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to

judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076, 1077 (8th Cir. 1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002).

**II.    Breach of Contract**

The Hecksels and CLA entered into a written contract, the LFA, which explicitly governs all transactions from June 10, 1998 forward and, accordingly, covers the Albany market cattle, the Florida cattle, and all subsequent deliveries of cattle from CLA to the Hecksels. The LFA supersedes any prior oral contract into which the Hecksels and CLA may have entered or oral representations that CLA may have made. *See Lehman v. Stout*, 112 N.W.2d 640, 643 (Minn. 1961) (under the principles of merger and integration, a written agreement between parties supersedes and merges any prior oral agreement even when the parties acknowledge differences with the prior oral agreement). In interpreting a contract, the Court may not consider "extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing." *Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn.*, 664 N.W.2d 303, 312 (Minn. 2003). "The determination of whether a contract is ambiguous is a question of law . . . If a contract is unambiguous, then the language must be given its plain and ordinary

meaning and will be enforced by the courts even if the results are harsh." *Bank Midwest, Minnesota, Iowa, N.A. v. Lipetzky*, 674 N.W.2d 176, 179 (Minn. 2004) (internal citation and quotation omitted).

The Hecksels assert that CLA violated various provisions of the LFA by purchasing rather than financing the cattle assigned to the Hecksels; delivering unhealthy cattle that were not cross-bred and failing to replace death loss; asserting a security interest in non-LFP livestock; requiring the Hecksels to engage in price protection strategies at their expense; failing to sell the LFP livestock for the most mutually beneficial price and failing to consult with the Hecksels in any way regarding the marketing and sale of the cattle; failing to conduct monthly inspections and creating false negative inspection reports, and charging excessive service fees and failing to weigh the cattle and/or provide scale tickets. The Court addresses each contention in turn.

The Hecksels' assertion that CLA, through Wegenast, orally contracted to finance cattle purchased by the Hecksels is directly contradicted and superseded by the language of the LFA stating that CLA is not loaning money to or financing the operation of the program participants and that all livestock remains the property of CLA at all time.

Sections 6 and 7 of the LFA require program participants to inspect the livestock delivered to them, and notify CLA of any problems concerning the quality of the livestock, including breed, injury, or illness, within 24 hours of delivery. Accordingly, the Hecksels were required to reject the allegedly ill pure-bred Florida cattle within 24 hours of their delivery. Although the Hecksels voiced concerns about the Florida cattle at the time of the delivery, they did not reject the cattle and, therefore, accepted the cattle

and waived any claims against CLA relating to breed, illness, or injury.[1] The LFA does not require CLA to replace any death loss. To the contrary, section 2 of the LFA explicitly requires the Hecksels to bear the burden of any death loss.

Section 14 of the LFA "grants CLA a Uniform Commercial Code security interest in all products and proceeds from the sale or other disposition of the Livestock, all offspring of the Livestock, and all livestock acquired by the Feeder or any other party after the date of the LFA to replace or substitute for the Livestock owned by CLA." (LFA 14(b).) The UCC statement, which the Hecksels signed, states that it covers "[a]ll livestock on Central Livestock Association/CRI's Livestock Feeding Program furnished to debtor by secured party, now owned or hereafter acquired, wherever located" as well as "[p]roducts, proceeds, and increase of livestock." (Finnerty Aff. Ex. P.) Contrary to the Hecksels' assertion, this language plainly limits CLA's interest to LFP cattle and does not constitute a blanket security interest in all of the Hecksels' cattle.

Section 16 of the LFA provides CLA the right to make "all decisions" related to marketing the livestock, and precludes any claim against CLA related to such marketing decisions. (LFA 16.) Accordingly, the Hecksels' claims related to CLA's marketing and sale of the LFP cattle must be dismissed.

Section 4 requires the participants to "provid[e] CLA with a completed and signed Monthly Livestock Inspection Report by the first day of each month that the Feeder is feeding Livestock owned by CLA." (LFA 4.) Section 11 provides that "CLA will have

---

[1] The Court notes the Hecksels' argument that having not yet seen a copy of the LFA when the cattle were delivered, they couldn't have known about or complied with this requirement. The Court finds this objection unavailing as (a) the terms of the LFA are clear and (b) there is no evidence that the Hecksels rejected or otherwise objected to the cattle during the 24 hours following their receipt and signature of the LFA.

the right to inspect the livestock . . . at any time." (LFA 11(a).) The Hecksels assert that CLA failed to conduct monthly inspections, required the Hecksels to sign blank inspection reports, and then used the signed blank forms to create false inspection reports. Assuming these allegations are true, they nevertheless do not violate the relevant LFA provisions, which require the Hecksels to conduct inspections, and permit, but do not require, CLA to conduct inspections.

Section 18 describes the allocation of proceeds from the sale of the livestock, and requires CLA to, upon sale, "promptly complete a Settlement Statement, and forward it to the [participant] along with all amounts payable to the [participant]." (LFA 18(c).) The Hecksels seem to allege that the Settlement Statements provided to them were inadequate because they did not contain or incorporate individual cattle weights or scale tickets. The Settlement Statements given to the Hecksels identify scale ticket numbers, which were apparently available for review at the LFP office, and list the total weight of the livestock sold in the particular transaction. Although the Hecksels may believe that common practice in the industry dictated inclusion of different or additional information, the Statements provided contain sufficient information to calculate proceeds under the LFA and do not violate any provision of the LFA.

Section 19 details the calculation of the variable service fee. Under section 19(b), the service fee "is a variable rate currently established at 10.5%. This rate may change depending on CLA's borrowing costs from its lenders to acquire the livestock." (LFA 19(b).) The Hecksels claim that the service fee was conclusively set at 10.5%, and that they were charged greater than 10.5%. The plain language of the LFA indicates that the rate may vary, and that 10.5% was the current, but not the permanent, rate to be assessed.

The Settlement Statements demonstrate that the Hecksels were assessed service fees ranging from 9% to 11.5%. This variation does not violate the terms of the LFA.

Section 15 of the LFA permits CLA to engage in hedging, regardless of the acquiescence or agreement of the LFP participants, and protects CLA from any claim in connection with any such price protection decisions. According to the Hecksels, at CLA's urging, they approached Curt Zimmerman about entering into two hedging contracts. Harlan signed an agreement acknowledging that $400 in brokerage fees was to be applied to his account, and that any loss would be the Hecksels' responsibility. Defendants assert that the additional deductions found on the Settlement Statements for "hedging" are losses taken on the positions, which, under the LFA, are properly assigned to the Hecksels. Based on the documentation provided to the Court, it is unclear whether the additional hedging charges are fees above and beyond the $400 that Harlan agreed to pay, or losses. Accordingly, the Court will not grant summary judgment with respect to this portion of the claim.

The Hecksels also complain that they were charged fees that (a) they were not obligated to pay and (b) were excessive, including insurance fees. The Settlement Statements reflect that, in addition to program and service fees, the Hecksels were assessed charges for insurance, transit insurance, feed, beef council, lien searches, identification costs, health inspections, and hauling. Section 7 provides that CLA shall be entitled to all of the deductions from the gross sale proceeds resulting from the sale of the Livestock that are set out in the Settlement Statement. Section 17 states that program participants are responsible for costs including labor, water, feed supplements, medications, veterinary services, insurance, utilities, equipment, machinery, vehicles, and

maintenance and repairs at the Feed Lots. Sections 25, 26, and 27 require program participants to maintain casualty, liability, and property insurance. Based on the provisions of the LFA and the record before it, the Court cannot determine, among other things, whether the LFA permits CLA to charge the participants for every expense incurred by CLA, regardless of (a) whether it is mentioned in the LFA; (b) whether the Hecksels were also obligated to, or did, perform such services or maintain seemingly duplicative coverage at their own expense; or (c) whether the expense is incurred at or away from the feed lots. Accordingly, summary judgment is not appropriate on this aspect of plaintiffs' claim.

## III.  Breach of Fiduciary Duty

The Hecksels allege that CLA breached its fiduciary duty to the Hecksels. A claim for breach of fiduciary duty includes four elements: (1) the existence of a duty; (2) breach of that duty; (3) causation; and (4) damages. *Conwed Corp. v. Employers Reinsurance Corp.*, 816 F. Supp. 1360, 1362 n.3 (D. Minn. 1993). Minnesota has recognized that a fiduciary duty may arise out of an otherwise ordinary contractual relationship where one party knows or should know that the other is placing trust and confidence in the first and relying on the first for counsel and information. *Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 623 (Minn. 1972); *see also W.K.T. Dist. Co. v. Sharp Elecs. Co.*, 746 F.2d 1333, 1336 (8th Cir. 1984); *H. Enters. Int'l Inc. v. Gen. Elec. Capital Corp.*, 833 F. Supp. 1405, 1421 (D. Minn. 1993) (*quoting Stark v. Equitable Life Assurance Co.*, 285 N.W. 466, 470 (Minn. 1939)). The existence of a fiduciary

relationship is generally a question of fact. *Minnesota Timber Producers Assoc. v. Am. Mut. Ins. Co.*, 766 F.2d 1261, 1268 (8th Cir. 1985).

Under the terms of the LFA, CLA retained ownership of the cattle at all times, was the sole decision-maker as to when, how and at what price to sell the cattle, and required the participants to absorb all of the risk regarding any losses. The Court finds that, under these circumstances, a jury could find that the Hecksels had no choice but to place significant trust and confidence in CLA to protect their interests, CLA knew or should have known that the Hecksels were dependent upon it to protect their interests, and that a fiduciary duty arose out of this contractual relationship between CLA and the Hecksels. In the event that a fiduciary relationship existed, material questions of fact remain as to whether CLA breached that duty by, for example, selecting and delivering unhealthy cattle, failing to provide inspections and related assistance to the Hecksels, charging excessive and unreasonable fees, not marketing appropriately, and failing to better and more fully inform the Hecksels of the terms of the contracts.

## IV.   Packers and Stockyards Act

The Hecksels allege that CLA's provision of services was unjust, unreasonable, unfair, and deceptive in that (1) Wegenast made deceptive representations to them in order to induce their participation in the LFP; (2) CLA did not act in the Hecksels best interests in marketing and selling the cattle; (3) CLA charged fees to which the Hecksels did not agree and which were unexplained; and (4) CLA kept and created improper and false records, all in violation of the Packers and Stockyards Act ("PSA").

Claims under the PSA, must be brought within four years after the action accrues. *Varner v. Peterson Farms*, 371 F.3d 1011, 1019 (8th Cir. 2004). Generally, the period commences on the date on which the wrongdoer commits an act that injures the business of another. *Id.* (*citing Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, (1971)). When a complaining party was fully aware of the terms of an agreement when it entered into the agreement, an injury occurs only when the agreement is initially imposed; thus, the limitations period typically is not tolled by the requirements placed on the parties under the agreement. *Id.* Furthermore, performance of an allegedly unlawful contract during the limitations period is not sufficient to restart the period. *Id.* The Court finds that all of the Hecksels' PSA claims are directly related to the terms of the LFA. As such, the injury occurred on July 1, 1998 and the claims are time barred.

## V.     **Commodities and Exchange Act**

According to the Hecksels, CLA used a person not licensed as a broker to run its hedging operations, who failed to make required disclosures and explanations, in violation of the Commodities and Exchange Act ("CEA"). Claims under the CEA must be brought within two years of the date the cause of action arises. 7 U.S.C. § 25(c). The hedging transaction at issue was entered into in 1999. The claim is, therefore, barred by the statute of limitations.

## VI. Racketeer Influenced and Corrupt Organizations Act

Plaintiffs allege that defendants engaged in racketeering in violation of 18 U.S.C. § 1962(c) and conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d).[2] To state a civil RICO claim, the Hecksels must prove CLA engaged in conduct of an enterprise through a pattern of racketeering activity. *Asa/Brandt, Inc. v. ADM Inv. Servs., Inc.*, 344 F.3d 738, 752 (8th Cir. 2003); *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir. 1997). Racketeering activity is defined in § 1961(1) as any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical, acts indictable under certain federal laws, and numerous other offenses. *See* 18 U.S.C. § 1961(1); *Handeen*, 112 F.3d at 1353. Plaintiffs' RICO claims fail because they have not adequately alleged any racketeering activity within the definition of § 1961(1). Specifically, contrary to their contention, the use of the mails and telephone in furtherance of a rather one-sided, but legal and largely unambiguous contract into which plaintiffs voluntarily entered is insufficient evidence to show the predicate acts of mail and wire fraud. *See United States v. Frost*, 321 F.3d 738, 740 (8th Cir. 2003) (listing the elements of mail and wire fraud). Accordingly, the Court will grant summary judgment to defendants on plaintiffs' RICO claims.

## VII. Minnesota Statutory Claims

The Hecksels assert claims under various Minnesota consumer fraud statutes related to the misleading nature of Wegenast's statements describing the LFP.

---

[2] In their memorandum in opposition to summary judgment, the Hecksels abandoned any claims under 18 U.S.C. §§ 1962(a) and (b).

The Minnesota Consumer Fraud Act prohibits the "act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."  Minn. Stat. § 325F.69, subd. 1.  Although the existence of a written contract that contradicts alleged oral misrepresentations does not, as a matter law, negate any possibility of proving reliance, *see Wiegand v. Walser Automotive Groups, Inc.*, 683 N.W.2d 807, 812-13 (Minn. 2004), the Court finds that, in this case, plaintiffs have not submitted sufficient evidence from which a jury could conclude that CLA intended the Hecksels to rely on Wegenast's statements.  Assuming, *arguendo*, that Wegenast provided the Hecksels inaccurate information about the LFP, he also made the Hecksels aware that they would be required to apply to and formally enter into a contract with CLA in order to participate in the program.  The Hecksels were subsequently provided with program materials, including the LFA.  When the Hecksels met with CLA to sign the LFA, Steve Church was very upset with the manner in which Wegenast had recruited the Hecksels to the program.  Church also reviewed at least some portions of the LFA with the Hecksels.  This provision of additional, specific, and accurate information, as well as Church's clearly demonstrated displeasure with Wegenast's work demonstrates that there was no intent that the Hecksels rely on Wegenast's statements in making their decision to enter the program.

The Hecksels also allege that Wegenast's statements regarding the nature of the LFP program violated the Minnesota Deceptive Trade Practices Act.  A claim under the MDTPA receives the same analysis as would a claim under the federal Lanham Act.

*Group Health Plan, Inc. v. Philip Morris, Inc.*, 68 F. Supp. 2d 1064, 1069-70 (D. Minn. 1999) (*citing Medical Graphics Corp. v. SensorMedics Corp.*, 872 F. Supp. 643, 650 (D. Minn. 1994)).  Thus, plaintiffs must establish that (1) CLA made false or misleading statements in its commercial advertising or promotion; (2) those statements actually deceived or have the tendency to deceive a substantial segment of their audience; (3) such deception is likely to influence buying decisions; and (4) the Hecksels have been or are likely to be injured as a direct result of those activities.  *Id*.  The Court finds that Wegenast's statements to the Hecksels do not constitute commercial advertising or promotion.

Minnesota Statutes section 17.90 subd. 1a, under which the Hecksels also assert a claim, provides a definition of an agricultural contract, but does not create a cause of action.  Finally, the Hecksels claim that CLA violated Minnesota Statutes section 336.9-625 by claiming a security interest in the Hecksels' non-LFP cattle.  As noted previously, CLA did not claim a security interest in the Hecksels' non-LFP cattle.

For the foregoing reasons, the Court will grant summary judgment to defendants on plaintiffs' Minnesota statutory claims.

**VIII.  Common Law Fraud**

The Hecksels assert that CLA, through Wegenast, fraudulently represented that CLA would finance the Hecksels' purchase of cattle, replace death losses, deliver crossbred cattle, deliver cattle in good condition, assist in marketing the Hecksels' cattle, and generally correct any problems the Hecksels had with the LFP.  Plaintiffs' claim of common law fraud fails because, as stated above, they have not presented sufficient

evidence from which a jury could find that CLA intended the Hecksels to rely on Wegenast's allegedly false statements. *See Davis v. Re-Trac Mfg. Corp.*, 149 N.W.2d 37, 38-39 (Minn. 1967) (elements of common law fraud claim include that the representation be false and that it be made with the intent of inducing another person to act on it). Furthermore, reliance on an oral representation that is directly contradicted by a written contract is unjustifiable as a matter of law in an action based on common law fraud. *St. Croix Printing Equip., Inc. v. Rockwell Int'l Corp.*, 428 N.W.2d 877, 882 (Minn. Ct. App. 1988).

## IX.   CLA's Breach of Contract Counterclaim

CLA seeks damages in the amount of applied proceeds, insurance, program fees, identification costs, and service fees accrued for 94 head of cattle that were delivered to the Hecksels, but were never sold. The Hecksels acknowledge that these cattle are dead. The LFA clearly requires the Hecksels to bear the burden of these losses. However, in light of the Court's determination that the LFA is ambiguous as to the specific fees and costs that CLA may assess the Hecksels, summary judgment on this claim is not appropriate.

This case will be placed on the Court's next available trial calendar. The November 2005 trial calendar has been set; a December 2005 trial setting is likely.

**ORDER**

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that defendants' motion for summary judgment [Docket No. 63] is **GRANTED IN PART and DENIED IN PART** as follows and in accordance with the above memorandum opinion:

1. The motion is **DENIED** with respect to plaintiffs' claim that CLA breached the LFA by charging costs and fees that are not specified in the LFA and by charging additional hedging fees.

2. The motion is **DENIED** with respect to plaintiffs' claim of breach of fiduciary duty.

3. The motion is **DENIED** with respect to defendants' counterclaim.

4. The motion is **GRANTED** in all other respects.


DATED:   September 29, 2005                     s/ John R. Tunheim
at Minneapolis, Minnesota.                       JOHN R. TUNHEIM
                                                 United States District Judge